# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT KNOXVILLE
## March 26, 2019 Session

## STATE OF TENNESSEE v. ZIBERIA CARERO

### Appeal from the Criminal Court for Knox County
No. 102133   Steven Wayne Sword, Judge

_____

### No. E2018-00684-CCA-R3-CD

_____

A Knox County Criminal Court Jury convicted the Appellant, Ziberia Carero, of possession of one-half gram or more of cocaine with intent to sell, possession of one-half gram or more of cocaine with intent to deliver, possession of one-half ounce or more of marijuana with intent to sell, and possession of one-half ounce or more of marijuana with intent to deliver.  The trial court merged the possession of cocaine convictions and merged the possession of marijuana convictions and sentenced the Appellant as a Range II, multiple offender to concurrent terms of twelve years and two years, respectively.  On appeal, the Appellant contends that the evidence is insufficient to support his convictions, that the trial court erred by denying his motion to suppress evidence found during his traffic stop, and that the trial court abused its discretion by admitting rebuttal evidence of his subsequent drug-selling activities.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court but remand the case to the trial court for correction of the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed, Case Remanded**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Forrest L. Wallace and Robert Edwards, Knoxville, Tennessee, for the appellant, Ziberia Carero.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Charme P. Allen, District Attorney General; and Philip H. Morton and Andrea Kline, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

# I. Factual Background

This case relates to a traffic stop and the discovery of drugs concealed on the Appellant's person. On the night of April 20, 2011, a Knox County Sheriff's Office (KCSO) drug interdiction officer initiated a traffic stop of the Appellant's car based on the Appellant's running a stop sign and failing to signal his turn. During the stop, officers found and seized 37.1 grams of marijuana, 3.25 grams of powder cocaine, and 7.71 grams of crack cocaine from a "Crown Royal" liquor bag that the Appellant had hidden in the crotch of his pants. The Appellant was charged in a five-count superseding indictment[1] with one count of possession of one-half gram or more of cocaine with intent to sell within 1,000 feet of a child care agency, one count of possession of one-half gram or more of cocaine with intent to deliver within 1,000 feet of a child care agency, one count of possession of one-half ounce or more of marijuana with intent to sell within 1,000 feet of a child care agency, and one count of possession of one-half ounce or more of marijuana with intent to deliver within 1,000 feet of a child care agency. The fifth count sought enhanced punishment under the criminal gang enhancement statutes, but the State dismissed that count before the Appellant's January 2017 trial.

The Appellant filed a motion to suppress the evidence found during his traffic stop. In the motion, he argued that the stop was invalid because the police lacked a legitimate basis for the stop, that the search of his person was invalid because the police lacked reasonable suspicion that he was carrying a weapon or probable cause that he possessed contraband, that the police detained him beyond a reasonable time necessary for the stop, and that the police had no valid reason to search his person.

At the August 17, 2012 suppression hearing, Sergeant Chris Bryant of the KCSO testified that on April 20, 2011, he was the supervisor of the drug interdiction task force, which was comprised of himself and three other officers.[2] That night, the task force officers, who were in unmarked police vehicles, were working in an inner-city neighborhood known for its drug activity. Sergeant Bryant saw a maroon Buick in the parking lot of a market on Central Street and began following the car after it pulled out of the parking lot. The driver proceeded slowly on back roads and turned left at a stop sign without stopping and without signaling the turn. Sergeant Bryant activated his vehicle's emergency lights and stopped the car.

Sergeant Bryant testified that he approached the driver, who was the Appellant, and that two passengers were in the car. Sergeant Bryant asked to see the Appellant's driver's license, and the Appellant handed him a Tennessee identification card. Sergeant

---

[1]Two earlier indictments were filed in the case.
[2]At the time of the Appellant's 2017 trial, some of the officers had been promoted or changed positions in the KCSO. However, we will refer to them throughout the opinion by their rank at the time of the suppression hearing.

Bryant said he asked the Appellant to step out of the car "so we could talk about his ID card." The State asked Sergeant Bryant why he had the Appellant get out of the car, and the officer answered, "Officer safety. There was other people in the vehicle. It was getting dark, and I always have people step out of their vehicle to talk to them one on one." As the Appellant exited the car, Sergeant Bryant noticed "a large bulge" in the Appellant's pants. Consequently, a K-9 officer was called to the scene.

Sergeant Bryant testified that Officer Adam Mitchell "took over the scene" while Sergeant Bryant "took a supervisory role in just overseeing the actions going on." The two passengers were removed from the car and moved to the sidewalk. The K-9 officer arrived, ran his dog around the car, and informed the drug interdiction officers that the dog had alerted on the car. At some point, Sergeant Bryant learned from dispatch that the Appellant's driver's license had been suspended.

On cross-examination, Sergeant Bryant testified that the other officers involved in the stop were Officer Mitchell, Officer James Durand, Sergeant James Hammond, and K-9 Officer Jason Myers. He did not recall Officer Adam Brown being at the scene. He said the Appellant's car drew his attention because he saw it pull into the Fresh Mart parking lot, which was in an area known to be frequented by drug traffickers, and "sit" for several minutes without anyone exiting the vehicle. He explained, "It's commonly known in the narcotic world that drug dealers will show up at a location, and their purchaser or supplier will not show up, and they will leave."

Sergeant Bryant testified that neither he nor any of the other officers issued traffic citations to the Appellant and that Officer Mitchell filed the warrants and report in this case. He acknowledged that the warrants and the report did not mention anything about the Appellant's failure to stop at a stop sign. He also acknowledged that no traffic was in the area when the Appellant turned left without signaling; therefore, the Appellant did not violate the law. He said, though, that "running a stop sign" was a violation of the law.

Sergeant Bryant testified that the bulge in the Appellant's pants was about the size of a grapefruit. Officer Mitchell patted down the Appellant to check for weapons and told Sergeant Bryant that he felt "a large object" in the Appellant's groin area. The K-9 officer was requested less than five minutes after the stop and arrived about seven minutes later. Sergeant Bryant could not remember which officer requested the K-9 officer and said it would have been an officer who arrived after the initial stop. Officer Myers walked his drug dog around the car, and the dog took less than two minutes to alert. When Officer Myers informed Sergeant Bryant that the dog had alerted, Sergeant Bryant instructed Officer Mitchell to search the Appellant. Officer Mitchell found the contraband in the Appellant's pants about thirty seconds into the search.

On redirect examination, Sergeant Bryant testified that he followed the Appellant's car for "[j]ust a couple of blocks" before he stopped the Appellant and that

he did not stop the Appellant until the Appellant "ran through the stop sign and . . . did not use a signal." When Sergeant Bryan approached the car, the Appellant did not have a driver's license and was subject to arrest. Sergeant Bryant said that having the Appellant get out of the car was part of his standard operating protocol for officer safety because more than one person was in the car. The Appellant's demeanor at that point was "[c]alm, a little shaky." The two male passengers were asked to get out of the car, per protocol, when the K-9 officer was called to conduct the search. Identifications were collected from them, and one of them was arrested because he had an outstanding warrant.

Upon being questioned by the trial court, Sergeant Bryant testified that he was "directly behind" the Appellant when the Appellant failed to come to a complete stop at the intersection and failed to signal the turn. Sergeant Bryant estimated that about ten minutes elapsed from the time he initiated the stop until the K-9 officer arrived.

K-9 Officer Jason Myers of the KCSO testified that on April 20, 2011, he and his drug dog, "Axel," were called to conduct a "vehicle sniff" of a maroon Buick. When he arrived, the car's three occupants were outside the car. The men were moved away from the car, and Officer Myers positioned Axel about fifteen feet downwind of the car. Officer Myers had Axel begin the search, and the dog immediately alerted on the front of the car by "vigorously trying to go up and down on the vehicle" and ultimately scratching on the front bumper. At that point, Officer Myers pulled Axel off the car. As he did so, Axel "continued to stay in odor and actually followed the scent of the odor almost up to defendant who was standing on the sidewalk in the area."

On cross-examination, Officer Myers testified that his patrol vehicle was equipped with a camera. To his knowledge, the camera was operating properly that day. On the day of the suppression hearing, though, he learned the video was unavailable. Officer Myers did not have to do anything to preserve the video in his patrol vehicle. Instead, he drove to "an off-site area" where the video was automatically and wirelessly downloaded and stored by the sheriff's department. He said he got a new vehicle in 2011 with the wireless video system. Prior to that time, his patrol vehicle used a VCR cassette tape. He was unsure whether he was using the old or new vehicle at the time of the Appellant's April 2011 arrest.

Officer Myers testified that he was called to the scene at 8:09 p.m. and arrived at 8:16 p.m. The Appellant was standing to the left and approximately twenty-five to fifty feet behind the car when Axel alerted on the car's front bumper. Axel alerted "all over the front" bumper without concentrating on either side of the car. On redirect examination, Officer Myers testified that he did not remember if any contraband was found in the car. He explained that it was not unusual for a dog to alert on a car in which no drugs were present due to the residual odor left behind, especially if a recent occupant had drugs hidden in his pants.

- 4 -

Upon being questioned by the trial court, Officer Myers testified that after he pulled Axel off the car, Axel immediately starting trying to find another source for the odor. Officer Myers allowed Axel to follow the source to the back of the car but stopped Axel when he realized the dog was going toward the Appellant and the two passengers, who were standing with some officers behind the car.

Officer Adam Mitchell of the KCSO testified that he did not stop the Appellant but arrived on the scene immediately and observed the entire stop. After Sergeant Bryant asked the Appellant to step out of the Buick, Officer Mitchell patted down the Appellant for weapons. The Appellant was very nervous and visibly shaking, and Officer Mitchell felt a bulge the size of a grapefruit in the front of his pants. Officer Mitchell could feel that the bulge was a bag rather than a weapon, so he did not search the Appellant at that time. He did not find any weapons on the Appellant.

Officer Mitchell estimated that the K-9 officer arrived about five minutes after he patted down the Appellant. Other officers had directed the two passengers to get out of the Buick, and Officer Mitchell patted down both of them as well. After the dog alerted on the car, Officer Mitchell searched the Appellant and found a large Crown Royal bag in the Appellant's crotch area. Inside the bag, Officer Mitchell found cocaine and marijuana that were packaged in several smaller packets. He did not search the car and could not remember if officers found any drugs in it. About $300 in cash was on the Appellant's person.

On cross-examination, Officer Mitchell testified that he was "right behind" Sergeant Bryant when Sergeant Bryant stopped the Appellant's car. At the Appellant's preliminary hearing, Officer Mitchell testified that he stopped the Appellant. He said that his testimony at the preliminary hearing was incorrect and that Sergeant Bryant initiated the stop. To the best of Officer Mitchell's recollection, Officer Durand and Sergeant Hammond pulled up as Officer Mitchell was getting out of his vehicle, and the K-9 officer arrived about five minutes later. He said that he frisked the Appellant for weapons for officer safety and that he and his fellow officers routinely patted down anyone they asked to step out of a vehicle. He stated that he saw the Appellant turn left at the stop sign without using a turn signal and that he wrote a warrant for the failure to signal the turn. He did not write a warrant for the Appellant's failure to come to a complete stop because he had already written the warrant for not using the turn signal. However, he could have written warrants for both violations. On redirect examination, Officer Mitchell testified that it was not unusual for all of the drug interdiction officers in a team to respond to a traffic stop.

On November 14, 2012, the trial court entered a written order denying the Appellant's motion to suppress. The court accredited the testimony of Sergeant Bryant and Officer Mitchell that the Appellant failed to come to a complete stop or signal his

turn. The court found that the officers' observation of the Appellant's failure to come to a complete stop was sufficient to justify the traffic stop regardless of whether they cited him for the violation. The court noted that the Appellant's failure to signal his turn was sufficient alone to justify the traffic stop based on Sergeant Bryant's testimony that he was directly behind the Appellant's car at the time of the turn.

Additionally, the trial court found that Sergeant Bryant had probable cause to arrest the Appellant when he asked for the Appellant's driver's license, the Appellant handed him an identification card, and he learned the Appellant's license had been suspended. Furthermore, Sergeant Bryant was "certainly justified" at that point in asking the Appellant to step out of the car so that Officer Mitchell could pat down the Appellant for officer safety.

The trial court then addressed the length of the detention and found that the Appellant's failure to have a valid driver's license would have extended the time normally needed for a traffic stop. Upon having the Appellant get out of the car, Sergeant Bryant noticed the bulge in the Appellant's pants and decided to have a K-9 officer search the Appellant's car. The trial court accredited the officers' testimony that the K-9 officer was called to the scene within five minutes of the stop and that the K-9 unit arrived about seven minutes later, a total of twelve minutes. The trial court concluded, "In light of all the circumstances of the stop, this is not an unreasonable amount of time and did not extend the stop any further than that necessary for the initial stop and subsequent discovery of a suspended license."

About four years later, the Appellant filed a motion to renew his motion to suppress, asking that the matter be reopened so that he could present the testimony of one of the passengers in the car at the time of the stop. The trial court granted the motion and held a supplemental hearing on February 5, 2016. During the hearing, Kenneth Wayne Washington testified that he was serving a twenty-one-year sentence for second degree murder. On April 20, 2011, he and another man went with the Appellant to the market on Central Street for gasoline. Washington was sitting in the back seat of the Appellant's car, the Appellant was pumping the gasoline, and the third man went inside to pay for the gasoline. During that time, two vehicles on the other side of the fuel island were involved in a small accident, which caused gasoline to spill onto the Appellant's car. The Appellant, therefore, had to clean the gasoline off his car.

Washington testified that after a few minutes, the Appellant got back into his vehicle and pulled out of the parking lot to drive through the neighborhood. Washington noticed a large Chrysler with dark tinted windows fishtailing behind the Appellant's car as the Chrysler accelerated to catch up to the Appellant. Washington told the Appellant that the Appellant was being followed, so the Appellant put on his flashers, stopped at the stop sign, put his car in park, and opened his door to ask the other driver, "'Why y'all on my butt like that?'" At point, the blue lights on the other car's front grill came on.

Washington said that the Appellant responded by closing the door, putting his vehicle back in drive, turning left, and parking in front of the second house on the right after the turn.

On cross-examination, Washington testified that he was able to recall the events from five years earlier with such detail because he had a good memory. He said he never knew the "government name" of the third man, who was the Appellant's "associate." Washington only knew the third man by his nickname, "Goon."

On February 23, 2016, the trial court entered "Supplemental Findings of Fact and Conclusions of Law Regarding Motion to Suppress" in which it found that Washington was not credible. The trial court reaffirmed its earlier denial of the Appellant's motion to suppress.

At the Appellant's 2017 trial, Special Agent Forensic Scientist David Franklin Holloway of the TBI testified as an expert in forensic chemistry that he analyzed the evidence in this case. The evidence consisted of three plastic "sandwich" bags of plant material, which he determined contained a total of 37.1 grams of marijuana; "a tied plastic bag corner" of white powder, which he determined contained 3.25 grams of cocaine; and three plastic sandwich bags full of an off-white solid material, which he determined contained a total of 7.71 grams of cocaine base, commonly known as "crack."

Officer Mitchell testified that he had been assigned to the Highway Interdiction Unit of the KCSO for approximately seven years, had extensive training in the field, and had participated in multiple traffic stops and drug-related arrests of drug users and drug traffickers. He described the Appellant's traffic stop and search and testified that the circumstances indicated to him that the Appellant's possession of the drugs was for resale rather than personal use. He explained that the Appellant's having three separate bags of marijuana was not consistent with personal use because a drug user generally carried a small, single bag of marijuana known as a "smoke sack." In addition, the amount of marijuana in each of the bags was more than an individual would have had for personal use, and the Appellant did not have any drug paraphernalia associated with personal use such as a grinder, "rolling" papers, or a pipe. The amount, manner of packaging, and lack of drug paraphernalia likewise indicated to him that the Appellant did not possess the powder and crack cocaine for personal use. He said that the three separate bags of crack cocaine were consistent with a dealer intending to resell the cocaine and that he had never seen a personal user carry that amount of powder cocaine. Additionally, the police did not find any razor blades or crack pipes to indicate personal use of the cocaine, and the Appellant did not appear to be under the influence of any intoxicant at the time of his arrest.

On cross-examination, Officer Mitchell acknowledged testifying at the Appellant's June 2011 preliminary hearing that the police found rolling papers in the

Appellant's car. He said at trial, though, that he did not remember finding anything in the car. He also acknowledged that some users "crumble[d] up" crack cocaine and mixed it with marijuana or sprinkled powder cocaine on marijuana before smoking it. However, he had never seen people use drugs in either manner.

The State's final two witnesses testified about the Appellant's possessing the drugs within 1,000 feet of a child care agency.

The Appellant called Sergeant Bryant to testify, and most of Sergeant Bryant's testimony regarding the stop and search mirrored his suppression hearing testimony. In addition, he testified that the Appellant never attempted to communicate with him before turning left at the stop sign and that he smelled "a slight hint" of raw marijuana coming from the Appellant's car when he approached the car after the stop. Sergeant Bryant asked for the Appellant's driver's license, but the Appellant handed him a Tennessee identification card. Therefore, Sergeant Bryant concluded that the Appellant did not have a valid driver's license. Sergeant Bryant said that he did not remember the Appellant's handing him a wallet and that "I generally don't make a habit of taking a wallet." At some point, Sergeant Bryant conducted a records check of the Appellant's identification card and learned the Appellant's driver's license had been suspended.

Sergeant Bryant testified that he had the Appellant get out of the car, noticed "a large bulge" in the crotch of the Appellant's pants, and had Officer Mitchell pat down the Appellant for weapons. Officer Mitchell did not find any weapons, so Sergeant Bryant "assumed" the Appellant had "some kind of contraband" in his pants and called a K-9 officer to the scene.

Sergeant Bryant testified that he did not remember if the police found rolling papers in the car. At the time of the stop, Officer Brown was a new officer in the Narcotics Unit. Sergeant Bryant said he did not remember Officer Brown being present at the stop; however, dispatch records showed Officer Brown was there. After viewing the "CAD," or "chain of events" report of the stop, Sergeant Bryant acknowledged that Officer Brown called in the Appellant's tag number to dispatch at 8:09 p.m., which was the same time that the K-9 officer was dispatched to the scene. The drug dog alerted on the car, and officers searched the car but did not find any drugs. Officer Mitchell then searched the Appellant and found drugs in his pants.

On cross-examination, Sergeant Bryant described his extensive history and training in drug enforcement and testified that he had been involved in numerous arrests of drug dealers and simple users. He said that marijuana and cocaine users generally had only a small amount of the drugs in their possession, usually just enough for a single day's use. On the day of the Appellant's arrest, Sergeant Bryant watched the Appellant pull up to the market in the high-drug crime area, stop at the edge of the parking lot, and remain in the same spot for five to ten minutes before pulling out. The Appellant did not

pull up to the gasoline pumps, and no one got out of the car. Sergeant Bryant explained why such activity was consistent with a drug dealer's behavior and said that he followed the Appellant's car in order to watch for a reason to conduct the traffic stop. He further testified that the amount of drugs in the Appellant's possession, along with the manner in which the marijuana and crack cocaine was packaged, was consistent with drugs intended for resale. On redirect examination, Sergeant Bryant acknowledged that he had heard of drug users combining powder or crack cocaine with marijuana in a single "joint" or "blunt" but that "I haven't seen it."

The Appellant testified that at the time of the stop he was living with a "lady friend" and working odd jobs for cash because his prior felony convictions of reckless aggravated assault and violation of the sex offender registry prevented him from obtaining regular employment. He said he became addicted to crack cocaine following a 2004 gunshot wound that caused debilitating pain and that his daily practice was to sprinkle his crack cocaine on top of his marijuana before rolling it up in a cigarette or cigar to smoke it. He estimated that in 2011, he was using $15 to $30 of crack cocaine per day.

The Appellant testified that on April 20, 2011, he and two friends, Kenneth Washington and Arshad Rucker, smoked marijuana and played video games at his house before leaving in his vehicle to purchase lottery tickets. They drove around the neighborhood for a while, and the Appellant stopped at the market on Central Street so Rucker could buy candy and the Appellant could buy gasoline. While they were there, someone filling a gasoline can spilled some gasoline onto the Appellant's car, and the Appellant used some water and a sponge to dilute the gasoline in order to prevent the gasoline from damaging his car's paint.

The Appellant testified that after he finished pumping the gasoline and Rucker came out of the market, they got back into the car and he drove toward a car wash. He denied that his car was ever stopped at the edge of the market's parking lot. He said he drove about two blocks and noticed in his rearview mirror that two vehicles were following him. He then noticed that the driver of the car directly behind him was accelerating, flashing the car's lights, and blowing the horn and assumed it was someone he knew. The Appellant pulled up to the stop sign and turned his "blinker" on. The car behind him was "constantly blowing the horn," so the Appellant put his car in park and opened his door to get out. However, the seatbelt caught him before he could exit his car. He shut the door, put the car in drive, and began his left turn. At the same time, the officer behind him activated emergency lights.

The Appellant testified that he pulled over, that an officer "smacked" the trunk of his car with the officer's hand, and that the officer told him, "'This MF thing ain't got no blinkers.'" The Appellant said that at least fifteen officers responded to the scene and that they made him sit in his car for ten to fifteen minutes before Sergeant Bryant

approached and asked for his driver's license. The Appellant told Sergeant Bryant that he did not have a license or insurance and handed Sergeant Bryant his wallet. Sergeant Bryant "walked off a few steps" and then came back and told him to step out of the car. At that point, Officer Mitchell patted down the Appellant, grabbed the back of his crotch, and asked him, "'What is this?'" Officer Mitchell told the Appellant to stand on the sidewalk, and the officers got Washington and Rucker out of the car.

The Appellant testified that a couple of minutes later, the K-9 officer arrived. The officer walked his dog around the Appellant's car and then suddenly went across the street to talk to a Caucasian couple who were sitting on a Mustang. The couple got off the car, "went down to their house or wherever," and returned to the scene. At that point, the K-9 officer announced that the dog had alerted on the Appellant's car. The Appellant responded to the officer that "'the dog didn't alert on it the first time.'" The officer repeated that the dog had alerted on the car and "put the dog up."

The Appellant testified that the officers searched his car but did not find anything. Subsequently, Officer Mitchell put on gloves, lifted the Appellant's shirt, and attempted to reach into his crotch area. However, Officer Mitchell's hand became stuck on the Appellant's belt. Officer Mitchell then pulled on the string that was attached to the Crown Royal bag, and the bag came out of the Appellant's pants. Officer Mitchell arrested the Appellant and put him into a police car.

The Appellant testified that about ten minutes later, Officer Mitchell told him that Officer Mitchell had found some drugs on the sidewalk. Officer Mitchell told the Appellant that he knew the drugs did not belong to the Appellant because the Appellant had been in the police car, but Officer Mitchell wanted to know who owned the drugs. When the Appellant refused to tell him, he informed the Appellant that he was going to charge the Appellant with possessing the drugs. The Appellant told the jury that the only drugs he had on his person that day were six or seven grams of high-quality marijuana and a dime-sized piece of crack cocaine that weighed about one-half gram. He admitted that he had rolling papers and a pack of cigars in his car and said that his only intention with the small amount of drugs was to use them for his daily habit.

On cross-examination, the Appellant testified that he supplied the marijuana he and his friends smoked earlier that night. He said he did not share his cocaine with his friends because his practice was to use it alone. He acknowledged that the Crown Royal bag was concealed in his pants but denied that it was large enough to create a visible bulge. He said that he never possessed the amount of drugs involved in this case and insisted that the officers, who were involved in some "shady" practices, were "framing" him. In support of his claim, he noted the lack of audio or video of the stop, which he found especially suspicious given that "[y]ou got all these officers, all these cars."

The State asked the Appellant if he sold cocaine to an undercover police officer on September 10, 2012, and the Appellant said no. He said that he had been wrongfully convicted in that case and that the case was being appealed. The State then asked if he had been found in possession of cocaine in an amount consistent for resell on October 4, 2012. The Appellant responded that "it was just a little over a gram" and that he had "intentions of chilling with a female associate," who turned out to be a confidential informant (CI). He acknowledged that he was convicted of statutory rape in August 2001 but said that he was coerced into pleading guilty.

The State called Officer Mitchell as a rebuttal witness. Officer Mitchell denied that he threatened to charge the Appellant with possessing drugs found on a sidewalk. He said all of the drugs found in this case came from the Crown Royal bag he retrieved from the Appellant's pants.

Investigator Michael Geddings of the Knoxville Police Department testified that in 2012, he was assigned to the repeat offender squad. On September 10, 2012, he participated in a controlled drug buy from the Appellant. Investigator Geddings explained that he went with a CI to a prearranged location. The Appellant approached the CI's vehicle, retrieved something out of the crotch of his pants, and got into the vehicle. The Appellant handed the CI "a baggie of a white rock like substance," the CI gave him $100, and the Appellant ultimately was convicted of a drug offense. About three weeks after the September transaction, Investigator Geddings found the Appellant with 1.7 grams of crack cocaine in a baggie in his pants pocket. The Appellant also was convicted of that offense.

Investigator Geddings testified that at the time of the controlled drug buy from the Appellant in September 2012, he was unaware of the Appellant's arrest in this case. He described his extensive training and experience with drug investigations and listed the same details recited by Sergeant Bryant and Officer Mitchell as indicators that an individual in possession of drugs intended to resell them.

The State showed Investigator Geddings the drugs that were seized from the Appellant on April 20, 2011. He stated that the marijuana and crack cocaine appeared consistent with drugs intended for resale due to their packaging and the quantity contained in each package. He said the powder cocaine could "go either way[,]" as he had seen individuals possess a similar amount intended for personal use. He estimated that in 2011, the "street value" of the drugs was $450 to $650 for the crack cocaine, $200 to $350 for the powder cocaine, and $700 to $900 for the marijuana.

On cross-examination, Investigator Geddings acknowledged that he did not know the Appellant prior to September 2012 and that he found out about the Appellant from the CI, who was paid for her services. The CI was a drug user, she and the Appellant had mutual friends, and she had purchased cocaine from him in the past.

- 11 -

At the conclusion of the proof, the jury convicted the Appellant of the lesser-included offenses of possession of one-half gram or more of cocaine with intent to sell, possession of one-half gram or more of cocaine with intent to deliver, possession of one-half ounce or more of marijuana with intent to sell, and possession of one-half ounce or more of marijuana with intent to deliver. The trial court merged the possession of cocaine convictions and merged the possession of marijuana convictions and sentenced the Appellant as a Range II, multiple offender to an effective sentence of twelve years in confinement.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant contends that the evidence is insufficient to support the convictions because it fails to show that he possessed the drugs for anything but personal use. In support of his claim, he cites his own testimony about being addicted to drugs and notes that, other than the manner of packaging, no other evidence showed an intent to deliver drugs such as digital scales, drug ledgers, cellular telephone records, large amounts of cash, weapons, or witness statements by anyone other than a law enforcement officer. He acknowledges that he may have been a "small-time drug dealer on occasion" but argues that evidence of his intent to distribute drugs in this case was "marginal at best" and certainly not sufficient to sustain his convictions. The State argues that the evidence is sufficient. We agree with the State.

On direct appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn.

Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

One who knowingly possesses one-half gram or more of cocaine with intent to manufacture, deliver, or sell is guilty of a Class B felony. Tenn. Code Ann. § 39-17-417(a)(4), (c)(1). One who knowingly possesses one-half ounce or more but less than ten pounds of marijuana with intent to manufacture, deliver, or sell, is guilty of a Class E felony. Tenn. Code Ann. § 39-17-417(a)(4), (g)(1). Moreover, Tennessee Code Annotated section 39-17-419 provides in pertinent part, "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." "Other relevant facts" that may give rise to an inference of intent to sell and deliver include the absence of drug paraphernalia, the presence of a large amount of cash, the manner of packaging of the drugs, and the street value of the drugs. See State v. Belew, 348 S.W.3d 186, 191 (Tenn. Crim. App. 2005) (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999)); see also State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (finding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding that testimony concerning the amount and the street value of the drugs was admissible to prove the defendant's intent).

Taken in the light most favorable to the State, the evidence shows that the Appellant had a Crown Royal bag concealed in the crotch of his pants. The bag contained 37.1 grams of marijuana that was packaged in three separate plastic baggies, 7.71 grams of crack cocaine that was packaged in three separate plastic baggies, and 3.25 grams of powder cocaine that was tied in a corner of a plastic baggie. The Appellant also had $300 in cash in his pocket. All three of the trained and experienced drug enforcement officers testified that the amount of drugs and the manner in which they were packaged indicated that they were intended for resale rather than personal use. Investigator Geddings additionally testified that the drugs had a total street value ranging from $1,350 to $1,900. From the evidence, a rational jury could have inferred that the Appellant possessed the drugs with intent to sell or deliver them rather than for his own personal use. The jury heard testimony about rolling papers in the Appellant's car and heard the Appellant claim that the officers added to the small amount of drugs he was carrying for his personal use in an attempt to frame him for a more serious crime. However, the jury obviously accredited the testimony of the officers, as was its prerogative. Accordingly, the evidence is sufficient to support the convictions.

B. Denial of Motion to Suppress

- 13 -

Next, the Appellant claims that the trial court erred by denying his motion to suppress. He asserts that (1) the officers should have cited and released him following his minor traffic violations pursuant to the "cite and release statute" without conducting the second search of his person; (2) the second search of his person, which occurred after the vehicle search revealed no contraband, exceeded the scope of the initial detainment; (3) the incriminating nature of the contraband was not immediately apparent during the initial frisk for weapons and, therefore, the second search was unlawful; and (4) the entire length of the detention was unreasonable. The State argues that the trial court did not err by denying the motion to suppress. We agree with the State.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution protect individuals against unreasonable searches and seizures. See U.S. Const. amend. IV; Tenn. Const. art. I, § 7. "These constitutional provisions are designed to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998) (quoting Camara v. Municipal Court, 387 U.S. 523 (1967)). A search or seizure conducted without a warrant is presumed unreasonable, and evidence obtained as a result will be suppressed "unless the prosecution demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement." Id. (citations omitted).

An exception to the warrant requirement exists when an officer has either probable cause or reasonable suspicion supported by specific and articulable facts that a criminal offense has been or is about to be committed. Terry v. Ohio, 392 U.S. 1, 21 (1968); State v. Binette, 33 S.W.3d 215, 219 (Tenn. 2000). Reasonable suspicion is an objective standard and must be determined from the totality of the circumstances. United States v. Cortez, 449 U.S. 411, 417-18 (1981); see Ornelas v. United States, 517 U.S. 690, 696 (1996). "An officer's subjective intention for stopping a vehicle is irrelevant, as long as independent grounds exist for the detention." State v. Orson Wendell Hudson, No.

M2004-00077-CCA-R3-CD, 2005 WL 639129, at *3 (Tenn. Crim. App. Mar. 15, 2005) (citing Whren v. United States, 517 U.S. 806 (1996)). An officer's observation of a violation of a traffic law provides an objective basis for stopping a vehicle. See, e.g., State v. Vineyard, 958 S.W.2d 730, 734 (Tenn. 1997); State v. Levitt, 73 S.W.3d 159, 173 (Tenn. Crim. App. 2001).

The Appellant argued at the suppression hearing that he did not commit a traffic offense to warrant the initial stop. On appeal, he concedes that the initial stop was justified but argues that Sergeant Bryant should have cited him for the minor traffic violations and that the officer's actions following the initial stop were constitutionally unreasonable and exceeded the limited purpose of the stop.

In conducting an investigative stop, an officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Moreover, the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." Florida v. Royer, 460 U.S. 491, 500 (1983). A traffic stop may be "unreasonable" if the "'time, manner or scope of the investigation exceeds the proper parameters.'" State v. Troxell, 78 S.W.3d 866, 871 (Tenn. 2002) (quoting United States v. Childs, 256 F.3d 559, 564 (7th Cir. 2001), and citing State v. Morelock, 851 S.W.2d 838, 840 (Tenn. Crim. App. 1992)). The relevant inquiry is whether the officer's actions were reasonably related to the traffic stop. Terry, 392 U.S. at 20; State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998). Reasonableness turns on the facts and circumstances of each case. United States v. Mendenhall, 446 U.S. 544, 561 (1980).

A request for a driver's license, vehicle registration, and insurance documents, as occurred in this case, is a reasonable investigative procedure consistent with the lawful scope of the initial traffic stop. State v. Harris, 280 S.W.3d 832, 840 (Tenn. Crim. App. 2008). A driver who is stopped for a traffic violation "should expect 'to spend a short period of time answering questions and waiting while the officer checks his license and registration, that he may then be given a citation, but that in the end he most likely will be allowed to continue on his way.'" State v. Donaldson, 380 S.W.3d 86, 94 (Tenn. 2012) (quoting Berkemer v. McCarty, 468 U.S. 420, 437 (1984)). "[W]here a de minimis intrusion ends and an undue delay begins is necessarily a fact-specific inquiry." Id. (citation omitted).

In this case, Sergeant Bryant testified that when he asked for the Appellant's driver's license and the Appellant handed him an identification card instead, he assumed that the Appellant did not have a valid driver's license. At some point, Sergeant Bryant confirmed that the Appellant's license had been suspended. The trial court found that the officers could have immediately arrested the Appellant based on his driving on a suspended license. We agree. See Tenn. Code Ann. § 40-7-118(b)(3)(C) (providing that an officer has the discretion to issue a citation "in lieu of the continued custody and the

- 15 -

taking of the arrested person before a magistrate" in cases in which the officer has arrested the person for driving on a suspended or a revoked license).

We further agree that the officers' asking the Appellant to step out of the vehicle and frisking him for weapons was not unreasonable. Our supreme court has held that a lawful stop of a vehicle "authorizes officers, as a matter of course, to require drivers to exit their vehicle," concluding that the inconvenience to the driver constitutes a de minimus intrusion when weighed against the safety of the officers. Donaldson, 380 S.W.3d at 92-93. In Donaldson, an officer stopped the defendant for a citable traffic violation and during the course of the stop asked him to step out of his vehicle. When the defendant did so, a bag of cocaine on the floorboard became visible to the officer. Id. at 88. Similarly, the large bulge in the Appellant's pants became visible to Sergeant Bryant after he asked the Appellant to step out of the vehicle. Sergeant Bryant then had Officer Mitchell frisk the Appellant for weapons. A protective frisk is warranted if an officer has a reasonable, particularized suspicion that a suspect may be armed. State v. Williamson, 368 S.W.3d 468, 474 (Tenn. 2012). Given the bulge in the Appellant's pants, Sergeant Bryant's suspicion that the Appellant was armed was reasonable. Upon frisking the Appellant, Officer Mitchell could feel that the bulge was a bag rather than a weapon and did not search the Appellant further.

We further agree with the trial court that the amount of time that elapsed from the initial stop to the drug dog's alert on the car was not unreasonable. The United States Supreme Court has held that a dog sniff performed on the exterior of a defendant's car "while he was lawfully seized for a traffic violation" does not "rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. 405, 409 (2005). However, an otherwise lawful canine sweep that is ancillary to a legitimate traffic stop may constitute an unlawful search if the suspect is detained beyond the time necessary to complete the traffic stop. See United States v. Place, 462 U.S. 696, 709 (1983); Troxell, 78 S.W.3d at 871. An officer may not prolong a traffic stop in order to conduct a dog sniff absent reasonable suspicion for the sniff. Rodriguez v. United States, 135 S. Ct. 1609, 1616 (2015).

As the trial court observed, the Appellant's not having a driver's license would have extended the amount of time normally needed for citing a driver who had failed to stop at a sign. In any event, Sergeant Bryant testified at trial that he could smell the faint odor of raw marijuana when he approached the Appellant's car. The odor gave him probable cause to search the car. See State v. Frederic A. Crosby, No. W2013-02610-CCA-R3-CD, 2014 WL 4415924, at *8 (Tenn. Crim. App. at Jackson, Sept. 9, 2014) (concluding that faint smell of raw marijuana coming from defendant provided probable cause to search him). Accordingly, he could extend the amount of the time needed for the stop in order to conduct a dog sniff of the vehicle.

- 16 -

Finally, we disagree with the Appellant's claim that the second search of his person was unreasonable. The Appellant cites Harris, 280 S.W.3d at 843, to argue that the search of his person following the failure to find contraband in his car exceeded "the scope of the constitutional justification for detaining him any further." However, as the State points out, Harris is easily distinguishable from the instant case. In Harris, this court concluded that a drug dog's alerting on the passenger side of a defendant's vehicle, alone, was insufficient to justify a search of the defendant. 280 S.W.3d at 844. Unlike the defendant in Harris, the Appellant had a bulge the size of a grapefruit in the crotch of his pants. Moreover, Officer Mitchell was able to determine during his frisk for weapons that the bulge in the Appellant's pants was not a weapon but a bag of some sort, and the drug dog attempted to follow the "scent cone" from the car to the location where the Appellant was standing outside the car. In sum, we conclude that the trial court properly denied the Appellant's motion to suppress the evidence found during the search.

## C. Admission of Evidence of Appellant's Subsequent Drug-Selling Activities

The Appellant contends that the trial court erred by allowing the State to present rebuttal evidence of his subsequent drug transactions. The Appellant argues that "the nature and extent of his drug-related activities that occurred nearly one and one-half years after these events is far too attenuated to assist the fact finder in determining [the Appellant's] intent on April 21, 2011," and that the prejudicial effect of such evidence substantially outweighed any probative value. The State argues that the trial court properly admitted the evidence pursuant to Tennessee Rule of Evidence 404(b). We agree with the State.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Usually, relevant evidence will be admissible. Tenn. R. Evid. 402. "Rebuttal evidence is 'any competent evidence which explains or is in direct reply to or a contradiction of material evidence introduced by the accused.'" State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000) (quoting Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979)). "The state is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" Id. (citing State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *4 (Tenn. Crim. App. at Nashville, Nov. 15, 1995)). "Like any other evidence, rebuttal evidence must be relevant and material to the facts at issue in the case." State v. Lunati, 665 S.W.2d 739, 747 (Tenn. Crim. App. 1983). The admission of rebuttal evidence is within the sound discretion of the trial court, and we will not overturn the trial court's decision absent an abuse of that discretion. See State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002).

Before the State cross-examined the Appellant, the trial court held a hearing pursuant to Tennessee Rule of Evidence 404(b) to determine whether the State could

question him about the September and October 2012 drug transactions and present rebuttal evidence about the transactions. Tennessee Rule of Evidence 404(b) generally provides that evidence of other bad acts is irrelevant and, therefore, inadmissible. However, Rule 404(b) also provides that evidence of other bad acts may be admissible for other purposes, such as "'to show identity, guilty knowledge, intent, motive, to rebut a defense of mistake or accident, or to establish some other relevant issue.'" State v. Moore, 6 S.W.3d 235, 239 n.5 (Tenn. 1999) (quoting State v. Hallock, 875 S.W.2d 285, 292 (Tenn. Crim. App. 1993)).

Before a trial court may permit evidence of a prior crime, wrong, or act, the following procedures must be met:

> (1) The court upon request must hold a hearing outside the jury's presence;

> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;

> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). If the trial court has complied with these procedures, this court will not overturn the trial court's decision to admit or exclude evidence under Rule 404(b) absent an abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

We find no abuse of discretion in the trial court's admission of the rebuttal evidence. During the trial court's Rule 404(b) hearing, it found that there was clear and convincing proof the Appellant possessed cocaine with the intent to sell on September 10 and October 12, 2012, that the evidence was relevant to prove the Appellant's intent in the instant case, and that the probative value of the evidence outweighed the danger of unfair prejudice. As for the fact that the crimes occurred subsequently to, rather than prior to, the offenses at issue, the trial court noted that Tennessee Rule of Evidence 404(b) speaks of "other bad acts" rather than "prior bad acts." See State v. Elkins, 102 S.W.3d 578, 584 (Tenn. 2003) ("We also note . . . that the plain language of Tennessee Rule of Evidence 404(b) . . . uses the phrase 'other crimes, wrongs, or acts,' rather than 'prior crimes, wrongs or acts.' Thus, Rule 404(b) would permit the introduction of evidence of subsequent acts to establish one's intent during a prior act in appropriate

cases."). The trial court concluded that because the subsequent convictions occurred within eighteen months of the incident at issue, their probative value on the issue of intent outweighed the danger of unfair prejudice to the Appellant. Additionally, the trial court gave two separate curative instructions, admonishing the jurors that they could not consider evidence of the Appellant's other crimes as propensity evidence to commit the crimes in this case and that they were to consider the rebuttal evidence only for the limited purposes of determining the Appellant's intent to sell or deliver drugs on April 20, 2011. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Therefore, we conclude that the trial court properly admitted the rebuttal evidence to show the Appellant's intent that he possessed the drugs only for his personal use.

Nevertheless, we must remand the case to the trial court for correction of the judgments of conviction because none of the judgments accurately reflect the indicted or convicted offenses. For example, in count one, the Appellant was indicted for possession of one-half gram or more of cocaine with intent to sell within 1,000 feet of a child care agency and was convicted of the lesser-included offenses of possession of one-half gram or more of cocaine with intent to sell. However, the judgment of conviction for count one names the indicted offense as "CONTROLLED SUBSTANCES: MANUFACTURE, DELIVERY, SALE OR POSSESSION OF .5 GRAMS OR MORE OF COCAINE, A SCHEDULE II CONTROLLED SUBSTANCE - 1000" CHILD CARE AGENCY §39-17-417" and names the convicted offense as "SCHEDULE II DRUGS: COCAINE - .5 GRAMS OR GREATER §39-17-417 (C)." Therefore, the trial court must correct the four judgments.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court but remand the case to the trial court for correction of the judgments of conviction.

_____
NORMA MCGEE OGLE, JUDGE